1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - X
UNITED STATES OF AMERICA, :
                          :
      Plaintiff,          :
                          :
vs.                       :      Case No. 3:13-cr-00015
                          :
ANGELO PETER EFTHIMIATOS, :    SENTENCING HEARING TRANSCRIPT
                          :
      Defendant.          :
- - - - - - - - - - - - - X


                          Courtroom, First Floor
                          U.S. Courthouse
                          131 East Fourth Street
                          Davenport, Iowa
                          Thursday, June 19, 2014
                          1:00 p.m.


BEFORE:  THE HONORABLE STEPHANIE M. ROSE, Judge.


APPEARANCES:

For the Plaintiff:        CLIFFORD R. CRONK, III, ESQ.
                          Assistant U.S. Attorney
                          U.S. Courthouse
                          131 East Fourth Street, Suite 310
                          Davenport, Iowa  52801


For the Defendant:        JOHN L. LANE, ESQ.
                          310 Law Building
                          225 Second Street SE
                          Cedar Rapids, Iowa  52401




              KELLI M. MULCAHY, CSR, RMR, CRR
                United States Courthouse
                 123 East Walnut Street
                 Des Moines, Iowa 50309

1          P R O C E E D I N G S

2          (In open court.)

3          THE COURT:  Thank you.  You can be seated.

4          We are here today in the matter of Criminal Case No.

5     3:13-cr-00015, United States vs. Angelo Efthimiatos.  The United

6     States Probation Office is represented by Katie Tady.  The

7     United States Attorney's Office is represented by Assistant

8     United States Attorney Clifford Cronk, and joining him is Case

9     Agent David Hoagland.  The defendant is personally present and

10    represented by his attorney, John Lane.

11         Mr. Efthimiatos, do you recall being in court on

12    December 20th and pleading guilty to a two-count superseding

13    indictment filed against you in August?

14         DEFENDANT EFTHIMIATOS:  Yes, ma'am.  Yes, I do.

15         THE COURT:  Specifically, you pled guilty to

16    conspiring to distribute, manufacture, and possess with intent

17    to distribute 50 kilograms or more of marijuana and possession

18    with intent to distribute marijuana; is that right?

19         DEFENDANT EFTHIMIATOS:  Yes, Your Honor.

20         THE COURT:  And those offenses are each punishable by

21    up to 20 years in prison, a fine of up to $1 million, a term of

22    supervised release of at least three years and up to life on

23    supervised release, and a $100 special assessment.  Do you

24    remember those penalties?

25         DEFENDANT EFTHIMIATOS:  Yes, Your Honor.

1      THE COURT:  And you understand you're here today to be

2  sentenced?

3      DEFENDANT EFTHIMIATOS:  Yes, ma'am.

4      THE COURT:  I have received and read the Presentence

5  Investigation Report in this case.  The most recent report is

6  dated June 10th and it's filed at Docket No. 196.

7      I've also received and read the sentencing memorandum

8  filed by Mr. Lane on your behalf, Mr. Efthimiatos.  That memo

9  was filed at Docket 198.  And I have also read all the letters

10  of support from your friends and your family members that were

11  sent to me either directly or forwarded to me by Mr. Lane.

12      And, Mr. Lane, I appreciate you getting those to me

13  ahead of the time for the sentencing.

14      I read Mr. Cronk's sentencing memo filed at Docket 202

15  as well.

16      And, Mr. Lane, I received your memorandum related to

17  the restitution issue as well, and I found that helpful.  Thank

18  you.

19      Mr. Cronk, did you have a chance to review the

20  Presentence Investigation Report on behalf of the Government?

21      MR. CRONK:  Yes, Your Honor.

22      THE COURT:  And can you summarize for me the issues

23  that I would need to resolve today from the Government's

24  standpoint?

25      MR. CRONK:  I'll try.  First, I think the Court has to

1  settle upon and make findings concerning the drug quantity that

2  should be attributable to Mr. Efthimiatos.  The Court has to

3  decide whether or not his objection for not having been given a

4  minimal role or minor role in the offense should be granted or

5  denied.

6          There's no objection to the special skill.  There's no

7  objection about the two-level reduction for acceptance of

8  responsibility.

9          The only other issue, I think, is whether or not

10 restitution should be ordered to Mr. Cooper and, if it is

11 ordered, to what extent should it be, what the amount should be.

12         THE COURT:  Thank you, Mr. Cronk.

13         Mr. Lane, did you have a chance to review the

14 presentence report with Mr. Efthimiatos?

15         MR. LANE:  Yes, Your Honor.

16         THE COURT:  And could you make a brief record of how

17 you did that?

18         MR. LANE:  Yes, Your Honor.  Well, upon receipt of the

19 first draft of the presentence report, Your Honor, I sent it to

20 my client.  I think he was at the Muscatine County Jail by then.

21 I then later visited him and we went through the report

22 paragraph by paragraph.  We then filed several pages of written

23 objections, Your Honor.

24         THE COURT:  And the issues that Mr. Cronk has

25 outlined, do you agree that those appear to be the active issues

1   to be resolved today?

2          MR. LANE:  Yes, Your Honor.  As I showed on page 2 of

3   my sentencing memorandum, I think that Mr. Cronk is right the

4   issue is quantity, the issue is a minor participant.  And then I

5   had two additional issues; whether or not the Court could vary

6   or wanted to vary downward two levels both because of the

7   upcoming guideline change effective November 1, 2014, and also

8   because of the reasons stated in United States vs.--I think

9   that's pronounced Dayi.  And then finally, Your Honor, as also

10  mentioned by the Government, restitution, if any, owed to

11  Mr. Cooper.

12         THE COURT:  Thank you, Mr. Lane.

13         Mr. Cronk, what is the Government's position with

14  respect to that two-level variance request regarding the

15  upcoming amendment to the sentencing guidelines, the drug

16  quantity table?

17         MR. CRONK:  I'm directed to take the position that the

18  Court should impose or should grant a two-level reduction with

19  the understanding that the record would reflect that in the

20  future if there is an actual change in the guidelines such that

21  it's retroactively applied to individuals sentenced prior to the

22  enactment of the change that the defendant would not be eligible

23  in the future for some sort of a reduction under 3582(c).  As

24  long as the record reflects that, I think the Government's

25  position is that it should be awarded.

1          THE COURT:  And, Mr. Lane, is your client agreeable to

2   waiving any right he may have for additional relief under

3   3582(c), at least provided that that amendment is only effective

4   as to those two levels?

5          MR. LANE:  May I have just a moment, Your Honor?

6          THE COURT:  Yes.  Go ahead.

7          MR. LANE:  We're agreeable to that, Your Honor.

8          THE COURT:  Okay.  Then I will grant that request for

9   a downward variance, as I have in other cases, and we'll make

10  sure we note in the J & C itself what that variance is and its

11  ramifications for future relief.

12          Let's go ahead and start, then, with the contested

13  issues, and we'll just sort of go through them in the order they

14  appear in the guidelines.  The first is drug quantity.

15          Here, Mr. Lane, as I understand it, you are seeking a

16  lower base offense level.

17          Mr. Cronk, you're seeking a higher base offense level

18  than was recommended in the presentence report.  The Government

19  bears the burden on this.  I don't know that we have much by way

20  of disputed facts so much as how we interpret those facts, but

21  do you have any additional evidence or argument you'd like to

22  present?

23          MR. CRONK:  I don't have any additional evidence.  I

24  just want to remind the Court of a few things, which include the

25  evidence that has been presented in this case, not just at the

1   suppression hearing and not just at the forfeiture hearing, but

2   also at the trial of Michael Efthimiatos, as well as Mr. Angelo

3   Efthimiatos' admissions when he pled guilty.  I'll summarize

4   those briefly and then just make an argument about what I

5   believe those mean.

6          As the Court's aware, the simple part is the 25 or so

7   kilos that Mr. Efthimiatos was caught with.  I don't think

8   anybody's arguing he shouldn't be held accountable for that.  He

9   actually pled guilty to 50 kilograms or more so there really

10   can't be an argument that it should be less than 50 kilograms.

11          Mr. Efthimiatos admitted that he had been doing this

12   in the past, he had done it ten years earlier with someone else

13   not in California but in the area of the northeastern United

14   States.  He indicated that in the previous year prior to

15   February of 2013 he had taken multiple trips to California using

16   aircraft, using different aircraft on each occasion.

17          We know that we've been able to document through

18   various sources that he and his brother both traveled to

19   California in April of 2012, we believe June of 2012.  We know

20   he purchased the Sierra aircraft in September of 2012 and flew

21   it to California in October of 2012.  We know he rented the

22   aircraft, the twin-engine belonging to Mr. Cooper, in February

23   of 2013, and in each of those occasions we believe we can show

24   that he rendezvoused with his brother in California.

25          And we, of course, have video of the duffel bags being

1  loaded--or not actually physically loaded all the way onto the

2  plane, but the strong circumstantial evidence is that those bags

3  were purchased in California, filled with marijuana, and then

4  placed in the aircraft for Mr. Efthimiatos to take off in the

5  early morning hours of February 19th.

6          When he was arrested--or not even arrested, stopped

7  and questioned, he repeatedly claimed that this was a very huge

8  operation.  He used the word "huge" or "really big" several

9  times.  He also admitted that he could assist the Government

10 because there was another load that he had arranged for in April

11 of 2013 of a couple of hundred pounds of marijuana.

12         He said that he had been taken to and seen and had

13 discussed with his contacts in California large warehouse

14 operations of indoor grows of high-grade marijuana that had the

15 ability to avoid detection from the air, again repeating that

16 this is a huge operation and that the Government must have had

17 somebody on the inside in order to catch him the way they did.

18         I think when you put all this stuff together, when you

19 consider the testimony of Jay Bump, the understanding that the

20 source area where he was traveling to get marijuana, his

21 admissions that he could get 200 pounds at one time, that he'd

22 already gotten 55 pounds in February, that he had made multiple

23 trips before that, and his admissions about the scale and scope

24 of the drug-trafficking operations in northern California, that

25 the drug quantities would be as huge as Mr. Efthimiatos says

1  they are and, of course, we know they are.

2         We know from our world's experience, from our life's

3  experience, from our criminal experience of dealing with people

4  that much, much larger loads of marijuana are interdicted on the

5  highway coming from California to New York or parts east, and

6  Mr. Efthimiatos was well aware of that.

7         Under the circumstances, I think that a Level 38--or a

8  Level 28 actually understates what was reasonably foreseeable to

9  him.  As Special Agent Bump testified, someone who can provide

10 50 pounds can provide 100 pounds.  If someone can provide 200

11 pounds on one occasion, there's no reason to believe they can't

12 provide 200 pounds on multiple occasions.

13        This isn't a one-time operation.  This happened over a

14 period of months, and Mr. Efthimiatos had a clear understanding

15 and knowledge about the people he was dealing with and how much

16 marijuana they could produce.  Under the circumstances, we think

17 that the base offense level should be in the area of 28 to 30,

18 and it's based on--  I mean, it could be much, much higher than

19 that, but just what's reasonable based on his own statements and

20 admissions, we believe it should be in the area of 28 to 30 and

21 not 26.

22        That's all I have.

23        THE COURT:  Thank you, Mr. Cronk.

24        Mr. Lane, do you have any evidence or argument you

25 would like to present on this issue?

1          MR. LANE:  No evidence, Your Honor, but I would have

2     some argument.

3          THE COURT:  Go ahead.

4          MR. LANE:  Well, Your Honor, first of all, this will

5     make the Court's job easier.  Plenty of information in the

6     presentence report, there's three drafts, but in any event, that

7     wasn't objected to by us.  That sets a factual background.  So,

8     for example, the Government included a lot of information

9     regarding Mr. Michael Efthimiatos' jury trial, and we reviewed

10    that, and so forth.

11         So I just heard argument from Mr. Cronk, but that's

12    not evidence, and even the evidence in the presentence report,

13    the unobjected to evidence, doesn't get it up to 400 kilograms,

14    which I think is the Government's requested base offense level.

15         Just very interesting, Your Honor, there's just

16    nothing to tag or cite, other than what few vague phrases that

17    Mr. Angelo Efthimiatos might have said.  Well, we think that the

18    U.S. Probation Officer scored it too high, but they themselves

19    rejected that higher 400 kilograms and up.

20         Interestingly enough, I've never seen this happen,

21    initially, when the first draft of the presentence came out,

22    that was on February 3 of 2014, U.S. Probation Officer didn't

23    even score the future trips, the 200 pounds that Mr. Cronk just

24    mentioned.  Instead they went and tried to calculate how many

25    trips had occurred in the past and then took the same quantity

1    that was seized from Mr. Angelo Efthimiatos.

2          That paragraph completely changed when the Government

3    then filed its objection and said the four prior trips can't

4    show more than whatever it was, 55 keys.  In other words, they

5    weren't saying that it was a much greater quantity.  That time,

6    at that time, then, U.S. Probation went back, and on, I call it,

7    the first final, it was the presentence report in April, went

8    back and went ahead and scored the 200-pound trip that was

9    discussed by Mr. Efthimiatos to the agents.

10          So it's a little bit like trying to hit a moving

11   target here, Your Honor, but clearly the U.S. Probation, the

12   Government and Defendant all have different scenarios.

13          I'd like to attach some numbers to the argument, and

14   it's this, Your Honor:  If this Court says that's too

15   speculative, that's not really foreseeable, who knew if that was

16   ever going to happen--  That's like asking somebody if they've

17   done a criminal act in the past if they don't get caught will

18   they do it again.  Not really an object of a conspiracy.

19          If the Court takes away those 200 pounds, Your Honor,

20   and essentially rejects the Government's claim, what we really

21   have here, Your Honor, is 25.31 kilograms for all the prior

22   trips.  And Ms. Tady had to actually go back in the presentence

23   report and reduce it down.  Then we have the instant offense,

24   which is 25.31 kilograms, the same amount.  That comes to 50

25   kilograms, 50.62 kilograms, Your Honor.

1              And so we think, and that's why we put it in our

2    sentencing memorandum, we think, Your Honor, that the Court can

3    have confidence finding that the amount that Mr. Angelo

4    Efthimiatos should be held responsible for is 50.62 kilograms,

5    and, as I mentioned in the sentencing issues, that would produce

6    a base level of 20 for at least 40 kilograms but less than 60

7    kilograms of marijuana, Your Honor.

8              In other words, in brief, not a lot to hang your hat

9    on in that it's 400 kilos or even more to justify a Level 28,

10   and we're essentially arguing, Your Honor, that if the Court

11   discounts the wild puffery statement by Mr. Efthimiatos that

12   there's another trip coming up, really, we're left with the

13   50.62 kilograms, Your Honor, and the base offense level of 20.

14             That's all I have under quantity, Your Honor.

15             THE COURT:  Thank you, Mr. Lane.

16             In this particular case, I do find by a preponderance

17   of the evidence that the amount of marijuana that the probation

18   office has calculated at a base offense level of 26 is the

19   appropriate base offense level.

20             And here's why I get to that place.  Here I think we

21   know very little of what the real story is of what was going on.

22   We really have pretty limited information, most of which comes

23   out of Mr. Efthimiatos' mouth when he's caught in February of

24   2013.

25             And then the Government, I think, here did an amazing

1 job of trying to corroborate, to the extent they could, the

2 little information that they gleaned.  They got travel records,

3 they got flight records.  They put together phone records.  All

4 of the pieces they could put together, they put together.

5          And when you look at that information, what we do have

6 solid evidence of or what I find to be reliable evidence upon

7 which to base my decision is these essential factual points:

8 The defendant made at least one trip with 55 pounds of marijuana

9 that nobody disputes here on February 19th, and that's the one,

10 of course, where the police encounter him; the defendant planned

11 a future trip involving 200 pounds of marijuana.

12          And here this isn't speculative.  I don't think that's

13 puffery.  He had purchased a plane for the purpose of making

14 that trip, he had taken concrete steps towards making that

15 flight.  He gave a very specific amount of marijuana.  This

16 wasn't just, "I've got a big trip planned."  He gave a number.

17 It's a number that's realistic based on the expert testimony

18 that I found credible that we heard during the trial, the

19 suppression hearing and the forfeiture hearings in this

20 particular line of cases.

21          Mr. Efthimiatos admitted making four prior trips in

22 2012 before that February 19th of 2013 trip.  On one of

23 those--or on the 55-pound trip, he made $18,000 he said.  On the

24 smallest of those four prior trips he said he was paid $5,000.

25 And he admitted to smuggling marijuana across the United States

1    border a decade ago, and that comes into play here only when I'm

2    looking at trying to convert the amount of money Mr. Efthimiatos

3    was paid into a real quantity to provide a reasonable estimate

4    of what those trips, those four trips of unknown quantity,

5    should be calculated as.

6             So if you look at the amount of money in the Canada

7    trip, essentially Canada trips, he was making $3,000 per 20

8    pounds of marijuana transported is what he said.  On the

9    smallest of his more recent trips he said he was paid $5,000,

10   and we know the most he was paid was $18,000.

11            So if you look at those numbers, basically,

12   Mr. Efthimiatos was paid somewhere between $150 and $327 per

13   pound of marijuana he transported.  And if you crunch those

14   numbers together, and, again, relying upon the expert

15   information that we had provided here from our DEA folks, you

16   get his smallest trip in 2012 to be no less than 33 pounds using

17   those dollars-per-pound figures.  We know the largest of those

18   was 55.

19            If you tally all of that up, assuming even the

20   smallest being 33 pounds and that all four of those prior trips

21   were 33 pounds, plus the 55 pounds and the 200 pounds, you get

22   to a base offense level of 26.  If you assume every one of those

23   prior trips was 55 pounds plus 200 pounds for the future trip,

24   again, we get to the Base Offense Level 26.

25            So the only way we get more than the base offense

1  level of 26 is if we can find evidence that there was more going

2  on or there were more trips.  I believe there was.  I think it's

3  a common-sense matter here to believe that there's more going on

4  than we know about because it doesn't make sense to swap out

5  planes for 50 pounds of marijuana.  It doesn't make sense to pay

6  somebody $18,000 to fly across the country with 50 pounds of

7  marijuana.

8          However, as much as I suspect that based on my common

9  sense and my training and experience, that's not evidence I can

10 rely on at the time of sentencing.  I can only rely on here what

11 I can find based upon the evidence we do have.  And so the

12 evidence we do have, as I've laid out before and what I am

13 relying on, is what gets us to the base offense level of 26,

14 which is essentially the undisputed facts of this particular

15 case that are known to us.

16          With respect to role in this case, Mr. Lane, that is

17 your particular burden.  Do you have any evidence or arguments

18 you'd like to make on that topic?

19          MR. LANE:  No evidence, Your Honor, just argument.

20          Well, Your Honor, we made that objection because the

21 application note to that guideline talks about and gives an

22 example of a pilot, and we wanted to preserve and reserve the

23 argument that Mr. Angelo Efthimiatos was a pilot, and that is a

24 recognized factor that the Sentencing Commission considered in

25 its application note.

1          I did note in the Court's orders setting the

2    sentencing in its footnote where counsel doesn't need to bother

3    with legal arguments regarding a variety of guidelines, and

4    that's because of the Court's prior experience as an Assistant

5    U.S. Attorney for 15 or more years.  I understand that, I

6    appreciate it.

7          THE COURT:  You can certainly make those arguments.  I

8    was just trying to save you time.

9          MR. LANE:  No.  I understand, Your Honor.  And, again,

10   it would just be telling you things you already know cold.

11          And so, Your Honor, we understand there's a weighing

12   aspect in here, and we think, though, that the undisputed

13   evidence here is that he's primarily a pilot and he doesn't have

14   as much involvement in the offense as the Government would want

15   you to believe, Your Honor.  That was the basis for the request

16   for a two-level downward departure for minor participant, his

17   status as the pilot, Your Honor.

18          Thank you.

19          THE COURT:  Thank you, Mr. Lane.

20          Mr. Cronk, argument you'd like to make?

21          MR. CRONK:  I don't think there's any legal basis for

22   the Court to conclude that Mr. Efthimiatos played a minor role

23   in this case.  I think there's some evidence that his brother

24   was more involved and had a higher position in this

25   organization.

1          And if they weren't brothers, if they were just two

2    strangers and Mr. Efthimiatos was paid to fly an airplane to

3    California and fly back, we might be having a different case

4    here, but that's not really what we have.

5          Mr. Efthimiatos is clearly deeply involved in this

6    conspiracy, and under the cases that I cite to the Court and the

7    guideline applications, I don't believe he qualifies for any

8    mitigating role.

9          THE COURT:  Thank you, Mr. Cronk.

10          This is a case where the Court finds, by a

11    preponderance of the evidence, that a mitigating role adjustment

12    should not be applied.  A two-level mitigating role adjustment

13    applies under 3B1.2 where a defendant is a minor participant,

14    and that generally means, under the definitions of the

15    guidelines, that the defendant is, quote, less culpable than

16    most other participants in the crime.

17          Here, where I have the same limited information I had

18    on making the drug quantity assessment, I have the same limited

19    information in trying to decide what the roles of the various

20    people involved in this case were.  At this point, the only two

21    participants that I have reliable information upon which I can

22    base decisions are Michael and Angelo.  These two individuals,

23    it's hard to know who's more culpable, but certainly neither one

24    of you appears to be substantially less culpable than the other

25    person.

1          What we know is that Angelo, as the pilot, is clearly

2   the person who has been responsible for flying loads of

3   marijuana back and forth across the United States.  What we know

4   about Michael is that he helped carry marijuana to the plane on

5   that February 2013 trip.  We know that he helped provide cash

6   cards or gift cards from Target footage.  We know that.

7          What that may mean is that Michael's higher in the

8   drug conspiracy and he's, in fact, the money man or the point of

9   contact for these California suppliers.  There's some evidence

10  of that from Michael's trial, that he's cashing in large amounts

11  of money, that he is uniquely in contact with these folks when

12  he's in California.  But it might also be that he's Angelo's

13  sidekick.  We just don't know.

14         And because I don't know and because this is the

15  defendant's burden, I find that the defendant has failed to

16  prove by a preponderance of the evidence that he should receive

17  a mitigating role adjustment.

18         So based upon those findings, let's go ahead and

19  compute an advisory guideline range, and then we can talk about

20  departures and variances.

21         Starting under United States Code Section--I'm

22  sorry--United States Sentencing Guideline Section 2D1.1, we have

23  the Base Offense Level 26, which I'll adjust for the variance

24  here in a moment based on the upcoming amendment to the drug

25  quantity table.

1         We have an undisputed two-level upward adjustment for

2    abuse of a position of trust or use of a special skill.  There

3    is a two-level decrease for acceptance of responsibility.

4         Mr. Cronk, it's my understanding you are not moving

5    for that third level; is that correct?

6         MR. CRONK:  That is correct.

7         THE COURT:  That leaves us, then, with a base offense

8    level of 28, which is, essentially--I'm sorry--26, which is 26

9    plus two less two.  Mr. Efthimiatos is a criminal history

10   category of I, which would give us an advisory guideline range

11   to start with of 70 to 87 months' imprisonment.

12        With the two-level variance based on the changes to

13   the drug guideline table that will be implemented on November

14   1st, we have a new range of 51 to 63 months' imprisonment as an

15   advisory guideline range.

16        Probation is an option, although it is not recommended

17   in this particular case.  Supervised release of three years to

18   life is applicable.

19        At a total offense level of 26, the recommended fine

20   range would be $12,500 to $125,000 as an advisory guideline

21   range, up to one million, of course, is what potentially the

22   fine could be here.  I don't believe that Mr. Efthimiatos has

23   the ability to pay a fine, and so ultimately I don't intend to

24   impose one.  Forfeiture has been discussed in great detail

25   outside of the confines of this particular hearing.  And there

1   is a special assessment of $100 per count.

2          That is essentially where we get to when we start

3   talking about an appropriate sentence.  That's our advisory

4   guideline range.

5          Mr. Cronk, what is your recommendation with respect to

6   an appropriate sentence in this case?  And if you could touch

7   upon the Government's position with respect to restitution as

8   requested by Jack Cooper, either now or towards the end of your

9   argument, I'd appreciate that as well.

10         MR. CRONK:  Before I do that, Your Honor, I direct the

11  Court's attention to paragraph--or Part B of the presentence

12  report which assesses the criminal history, and either I missed

13  something or the Court misspoke, but my understanding is the

14  defendant is not a Criminal History Category I, he's a Criminal

15  History Category II.

16         And I look at paragraphs 102 and 103 of the

17  presentence report, and it describes him as having a criminal

18  history category of II at a Level 26, but we're really at a

19  Criminal History Category II at a Level 24 based on the

20  adjustment the Court did for drug quantity, and that means that

21  the guideline range, instead of 51 to 63 months, should be 57 to

22  71 months.  And I want to make sure the record's clear on that,

23  and if I made a mistake, I'm sorry.

24         THE COURT:  You did not.  That was my mistake, and I

25  was reading off of a note that was not as clear, and, in fact,

1   my clerk handed me the same note as you were standing up.

2          So that is correct, he should be a criminal history

3   category of II, which gives us advisory guideline range before

4   the variance, 26-II would be, as you said, 70 to 87 and 24-II

5   would be 57 to 71 months' imprisonment.

6          Thank you for that clarification, and go ahead with

7   your argument.

8          MR. CRONK:  Thank you, Your Honor.

9          This is difficult for me to give the Court what I

10  consider to be the right answer.  The way this thing has gone

11  and how long it's lasted, the fact that we actually indicted him

12  for a higher drug quantity and superseded with a lower amount

13  which benefited him substantially, the frustration that I have

14  over not knowing, as the Court doesn't know, who were his

15  customers and who were his suppliers and what was the

16  otherwise--what was the method that they were using for

17  distributing this high-grade marijuana.

18         I've had dozens of interdiction cases with people

19  seized with a much larger amount of marijuana that had

20  absolutely no idea who got the marijuana and who it was going

21  to.  They were driving loads in cars and they were paid.  I was

22  in El Paso for two years, and we had dozens of cases of people

23  that just claimed they were paid $100 to drive a car across the

24  bridge into the country.

25         We're dealing with someone with a whole lot more

1 information than that.  This is not a mule or a transporter who

2 got caught simply with 25 kilos of marijuana.  This is an

3 individual who was deeply involved in this conspiracy.

4        Don't know how he made the decision to do it.  I don't

5 know why, with a wife and a child back in Connecticut, that this

6 seemed like a good idea.  I don't know why, after doing it one

7 time in April of 2012 that he decided again to do it three

8 months later and again three or four months after that and again

9 three or four months after that.

10        This is not a poor--  This is not a sort of mistake in

11 judgment on a particular day where he made a bad choice.  This

12 was a deeply considered and concerted effort to start to bring

13 large amounts of high-grade marijuana to the people in northeast

14 United States.  I don't know who it was getting to, but I can

15 guarantee you that it was not going all to adults.

16        And this idea that marijuana is not a big deal and

17 that it's being decriminalized in other places, I beg to differ.

18 It's a very big deal.  This activity is dangerous, it's high

19 risk, and in this case it was long-standing and lasted over a

20 period of at least a year if you don't count what he admitted he

21 did years earlier.

22        The fact that he was flying small single-engine planes

23 over the Rocky Mountains for the sake of getting a few pounds of

24 marijuana, risking his own life and leaving his wife and child

25 behind, shows the dedication that he had to this illegal

1   endeavor.

2           The idea and the thought and then the reaching the

3   actual concrete decision to purchase aircraft for the purpose of

4   transporting drugs, upgrading to the next size so that he could

5   have even a more comfortable ride with more marijuana shows the

6   Court that this is not somebody who should be treated as if he

7   had no knowledge of the operation and just got caught one time

8   with marijuana.

9           With the guideline range of 57 to 71 months,

10  considering Your Honor's heard how many times he's been

11  arrested, how many times he's been convicted, the kinds of

12  things that he's done in the past, the fact that he hasn't

13  learned that crime doesn't pay suggests a sentence below the

14  bottom of the guideline range?  I'm asking the Court to sentence

15  him to 70 months in prison.

16          THE COURT:  Thank you, Mr. Cronk.

17          Mr. Lane.

18          I'm sorry.  I apologize, Mr. Lane.

19          Can you talk to me about restitution, Mr. Cronk?

20          MR. CRONK:  Your Honor, I think it's discretionary.  I

21  don't know.  I don't know.  Your Honor heard the testimony of

22  Mr. Cooper when he was here.  He testified to the damage to his

23  plane.  I understand his restitution claim includes flying out

24  to retrieve his aircraft and the storage fees and things like

25  that.

1          I would ask the Court to order restitution at least

2     for the damage done to the plane, and I think that's

3     quantifiable.  I would ask the Court to impose that.

4          THE COURT:  Thank you, Mr. Cronk.

5          Mr. Lane.

6          MR. LANE:  Well, Your Honor, someone can call a series

7     of events big time, big threat, big danger, and if they say it

8     enough times, I guess that speaker expects it to be believed.

9     I'm sorry.  Maybe it's 33 years of practicing law.  This isn't a

10    big marijuana conspiracy.

11         And I'm glad Mr. Cronk shared his El Paso experience

12    because it's nothing compared to what they're typically

13    prosecuting in the Northern District of Iowa.  So it's 100

14    kilos, as determined by the Court.

15         And I slightly take offense at Mr. Cronk's statement

16    that not all is going to adults, the implication it's going to

17    children.  If he's saying kids in high school are going to

18    experiment with marijuana, he's probably right.  He just got

19    done saying, though, that he doesn't know the facts of this

20    case.  So if there's some kind of suggestion or wants to leave

21    it on the tip of the Court's mind that somehow this was

22    intended, destined for less than adults, not supported in the

23    least, just pure puffery.

24         Your Honor, I think that the appropriate sentence is

25    credit for time served.  As of today, Mr. Efthimiatos has served

1   16 months in either the Scott County Jail or the Muscatine

2   County Jail, and, given all of the facts of the case, Your

3   Honor, that's a pretty good sizeable penalty, and I know the

4   Court hasn't discussed the other variance request I've made, or

5   a period of probation with credit for the time served that he's

6   already spent, and perhaps he'll be closely monitored out in

7   Connecticut.

8           But I don't think his conduct in this--  And that's

9   not to excuse his conduct.  I just don't think his conduct in

10  this case, at least based on my experience, and certainly based

11  on the Court's experience, warrants a 70-month sentence.

12          Regarding the restitution, I just don't think it's

13  authorized by the Code.  I understand it's discretionary.  We're

14  at a loss to understand what the damage is.  He rented the

15  airplane.  Something's wrong with it.  That's Mr. Cooper's

16  responsibility.  No one's--  There's nothing in the file that

17  says somehow my client intentionally damaged it.  If it burned a

18  valve or needed this or needed that, that's the cost of doing

19  business if you're going to start leasing airplanes.

20          In my opinion, and as I put in my memorandum of

21  authorities, Your Honor, I don't think the restitution is

22  supportable by the statute.  It's an arm's-length transaction

23  between two people.  There's no doubt about it that my client

24  owes Mr. Cooper money.  That it should somehow take on the

25  clothing of a restitution order in a criminal case we just

1   completely disagree with, Your Honor.

2           He seemed like a fine gentleman, but at the same time

3   him being a fine gentleman doesn't make him entitled to some

4   $17,000 of restitution, Your Honor.  We think the Court should

5   order zero.

6           The Court's already mentioned that given

7   Mr. Efthimiatos' financial position it's not going to order a

8   fine.  As I mentioned in my sentencing memorandum, Your Honor,

9   that's another factor the Court must consider in any case when

10  ordering restitution, what the impact or financial impact is on

11  the defendant and the defendant's family.  Another reason to

12  decline or deny the request for restitution, Your Honor.

13          Thank you.

14          THE COURT:  Thank you, Mr. Lane.

15          Mr. Efthimiatos, this is the time in the sentencing

16  hearing when you are allowed to say what you might want to say

17  to me or to the family that's here to support you.  You don't

18  have to say anything, and certainly a number of people in your

19  family and friends have written very nice and important letters

20  of support for you, but I'm happy to hear whatever you might

21  wish to say.

22          DEFENDANT EFTHIMIATOS:  It's obviously been a very

23  difficult time.  You know, I want to apologize to my family.

24  This definitely wasn't a career choice.  I've done a lot of good

25  things in my life, a lot of real good things, and this does not

1    define how I am.

2            We put ourselves in a very bad financial situation.  I

3    made some very bad choices.  I would have done it on horseback

4    for my daughter.  Obviously, I wouldn't do it again.  I've

5    missed--  I miss seeing her and being in her life.

6            I definitely--  Oh, God.  I definitely deserve to have

7    been incarcerated.  I shouldn't be punished for what I have not

8    done, what I had no intention of doing, what I had no ability to

9    do.  I had no authority to make that decision.

10           I said what I said in order to get home.  I was

11   willing to cooperate at the airport, I was willing to fly the

12   load of marijuana I had to Connecticut so they could pick up the

13   guy that was going to pick it up.  I wasn't truthful about the

14   200 pounds.  I just wanted to get home.

15           You know, I just hate to see my daughter grow up

16   without me for something that I didn't do.  That's it.  I'm

17   sorry.

18           THE COURT:  Thank you, Mr.--

19           MR. LANE:  Your Honor, may I supplement my statement?

20           THE COURT:  Yes.

21           MR. LANE:  One of the things you held for later was

22   the variance, and I do see the Dayi issue as separate.  I'm not

23   going to say anything more than--  I attached a copy of the

24   opinion.  I would just incorporate those statements.

25           I understand that was only a district court decision

1  out of Maryland, it's not an Eighth Circuit or appellate level,

2  but we do think that there are some good statements in there by

3  the judge that would warrant consideration for a less sentence,

4  maybe not as structured as two levels but even greater than--a

5  greater reduction than two levels, Your Honor.

6       Thank you.

7       THE COURT:  Thank you, Mr. Lane.

8       Mr. Efthimiatos, I am sure Mr. Lane has explained to

9  you that judges like me who sit in the Midwest are governed by

10 the Eighth Circuit Court of Appeals, and that Court of Appeals

11 has told us that in imposing a sentence I have to take three

12 steps.

13      Step one is to look at the statutory penalties, which

14 is why at the beginning of your hearing we talked about those

15 sort of up to 20 years and up to a million dollars kinds of

16 penalties.

17      And the second step is to consider what the guidelines

18 recommend, and that's why we spend all the time we do talking

19 about drug quantity and role and criminal history and things

20 like that.

21      The third step is what's called a 3553(a) analysis,

22 and that is something or a term, really, that means nothing to

23 people who don't practice federal criminal law, but it is

24 essentially a list of things that the judge is supposed to

25 consider about the crime itself and the person who committed

1  it, essentially, the nature and characteristics of those

2  things.

3  And in your case, I have taken all three of those

4  steps.  Your case has always been fairly mysterious to me.  What

5  we do know is that you were transporting loads of marijuana from

6  the East Coast--or from the West Coast to the East Coast and you

7  got caught with about 55 pounds of that marijuana.  That's what

8  we know for sure.

9  What we don't know is really almost anything else.  We

10  don't really know what Michael was doing with you.  We don't

11  really know who the two of you were working for or with.  We

12  don't really know where the marijuana was going.  We just don't

13  know all of those things.

14  And that has both costs and benefits for you.  The

15  benefit is you may well have been hugely involved and you're not

16  getting credited for all of that because we don't know.  It may

17  also be that you're not getting credited for the more minor role

18  you did play because we don't know.

19  But, as I said earlier, what I have to do is make my

20  decision based only on what we do know, and I have limited

21  information about you.  So what I do know about you is, as we've

22  talked about, the facts of your case, but also your history.

23  I certainly met a number of your family members during

24  your brother's trial.  You are a 44-year-old man.  You were born

25  and raised in Connecticut.

1          You've been married three times.  You had two children

2    with your first wife, and I think those children are now

3    teenagers who live in England, and you have virtually no contact

4    with them.  You don't provide any financial support for them

5    that I can see.  You had a child with your second wife, I think

6    she's now 11, lives in North Carolina.  Again, you have

7    virtually no contact with that child.

8          You've had two children with your current wife, and

9    you lost one of those children, and I am very sorry for that.

10   That's a horrible thing for any parent to suffer.  Your daughter

11   fought and stayed with you and is doing pretty well.  She's got

12   some developmental delays, but I read all of her records, she

13   sounds like a really sweet, delightful little girl.  And it

14   seems like she's getting absolutely the health and treatment

15   that she needs to become a healthy adult.

16         You have, by all accounts, a loving relationship with

17   your wife.  She's very supportive of you.  You appear to be very

18   supportive of her.

19         And you have no real serious physical problems, you

20   have no real serious mental health problems, you have no real

21   serious substance abuse problems.

22         You have been largely self-employed your entire adult

23   life, and I actually think that may be one of the problems.

24   Some of your self-employment ideas have worked, some of them

25   have not.  Some of them could charitably be called

1  get-rich-quick schemes, some of them could less charitably be

2  called scams.

3           It's clear in looking at your employment history and

4  in looking at the number of people who you've borrowed money

5  from or loaned money to that you don't make good business

6  decisions, and apparently neither do the people around you.  So

7  one of the things we're going to talk about a little bit later

8  is a condition of supervised release about how you look at

9  employment going forward.

10          Your criminal history, although you are a Category II,

11  is really pretty minor.  You've got this burglary that happened

12  to somebody who owed you money, you've got a failure to appear,

13  and you've got a criminal contempt relating to your second wife.

14          Looking at all of those things, in part,

15  unfortunately, for you, there just isn't anything I can find

16  there to vary because I just don't know enough to vary.

17  Generally speaking, I think the drug guidelines are fairly high

18  in our country and I frequently do vary in drug cases, but I do

19  that in cases where I feel some comfort with what has happened,

20  where we've got defendants who've come in and are completely

21  honest, who debrief, who cooperate, who accept responsibility

22  fully, who I feel like, coming into court and sitting on the

23  bench, I know what happened.  I don't have that in your case.  I

24  don't have even the remotest confidence that I really know what

25  happened.

1           And I'm not going to punish you, I wouldn't punish you

2     for not cooperating.  That's your choice and that's your right.

3     But I also can't reward you in the way I would reward somebody

4     who did cooperate because I just don't know enough to use that

5     information wisely.

6           And so ultimately in this case I am going to impose a

7     sentence at the bottom of your guideline range, which is 57

8     months.  And you will receive credit for the time that you've

9     already served.  I impose that on each of Counts 1 and 2 to be

10    run concurrently or at the same time.

11          I will recommend to the Bureau of Prisons that they

12    place you as close as possible to your family.  Do you want that

13    family to be your daughter and wife or--

14          DEFENDANT EFTHIMIATOS:  Yes.

15          THE COURT:  --do you have some other requests?

16          DEFENDANT EFTHIMIATOS:  My daughter and wife.

17          THE COURT:  Okay.  And they are still living in

18    Connecticut?

19          DEFENDANT EFTHIMIATOS:  The closest place would be

20    Otisville, New York or Canaan, Pennsylvania.

21          THE COURT:  And, Mr. Lane, do you know what level

22    those facilities are?

23          MR. LANE:  Never heard of them, Your Honor.  I'm

24    sorry, I don't.

25          THE COURT:  Okay.  Then we will list it as--  And can

1  you tell me what city your wife lives in?

2          DEFENDANT EFTHIMIATOS:  North Salem, New York.

3          THE COURT:  Then we'll list it as the closest facility

4  to North Salem, New York, that's consistent with your security

5  designation.  You'll probably be eligible for a camp--

6          DEFENDANT EFTHIMIATOS:  Right.

7          THE COURT:  --almost immediately and so we wouldn't

8  want to stick you closest to North Salem if it meant a

9  penitentiary, so they'll look at your security needs as well.

10         Any other program requests, Mr. Lane, or--

11         MR. LANE:  Doesn't have a considerable drug history,

12 Your Honor, so--

13         THE COURT:  I agree.

14         MR. LANE:  --I'm not sure he would.  Even if the Court

15 recommended, I'm not sure the BOP would structure it that way.

16         THE COURT:  Right.

17         Mr. Efthimiatos, when you arrive after your prison

18 sentence, you will serve a three-year term of supervised

19 release.  That will have all the standard conditions of release;

20 you can't commit new crimes, you can't use drugs, you can't have

21 guns, things like that.

22         You'll also have a few special conditions of release

23 that we'll talk about here.  In deciding what kinds of special

24 conditions of release to impose, I have made an individualized

25 and particularized assessment based on your history and based on

1    the factors in your case with a goal towards making sure you get

2    whatever treatment and assistance we can provide to help you

3    really get back into society so you don't ever have to see me

4    again and I don't have to see you again and you get a fresh

5    start and you move on with your life.

6              So of those conditions, the first is what's called a

7    search condition.  And this is standard in almost all drug

8    cases, and I impose it here as well.  What that means is that

9    the probation office has the ability to come into your house and

10   search you or your house, your car or your businesses, only if

11   they have a good reason to believe you're breaking the law or

12   you're not violating--I'm sorry--you're violating a term and

13   condition of supervision.  They have to do that in a reasonable

14   way and at a reasonable time if they choose to do that, and they

15   can bring the marshals with them for your sake or for theirs.

16             I also am going to, for the reasons we talked about,

17   as you come out of prison and you get employed, I am going to

18   prohibit self-employment, meaning I would like you to work for

19   somebody else.  Now, that's a condition we can revisit if you

20   have things that are going well, but I want you to learn to work

21   with an organized group of people who are not in it to get rich

22   quickly, who are not unstable.

23             You've had so many failed businesses and you've had so

24   many problems with those failed businesses, and I would guess

25   this crime is motivated in part by some of those failures, that

1    I want you to have some stability from employment.

2          Now, that doesn't mean that you can't work with your

3    family.  I know they've got a number of successful businesses.

4    And the probation office will talk to you about those things.

5    But what I don't want is sort of a new start-up company that

6    you've got going where you get in with yourself and a couple of

7    friends or whatever and you start a new business.  Not during

8    supervision.  So I'm going to prohibit, as a term,

9    self-employment in that way.

10         I do find that some restitution to Mr. Cooper is

11   appropriate here.  I don't find the full amount that he's asked

12   for is appropriate here.  In this case, this is essentially a

13   discretionary restitution case.  I do find that the damage to

14   the plane that Mr. Cooper described during the course of some of

15   our hearings in this case that was created by, essentially, the

16   landing and some of the other things is a proximate harm that

17   was suffered as a result of the criminal activity.

18         However, I don't find that the entirety of the

19   expenses related to repairs is necessary here because in looking

20   at the invoices it looks like at least some of those repairs

21   were essentially the kinds of maintenance issues, as Mr. Lane

22   has raised, that are engendered by leasing planes as opposed to

23   you landing suddenly in the middle of Washington, Iowa's airport

24   or flying routes that were not expected by Mr. Cooper when he

25   rented you that plane.

1           I do not provide as part of restitution the rental

2    costs themselves.  That was a contractual relationship between

3    the two of you that you would have had to pay no matter what you

4    did with the plane.  I don't find that the fuel and oil change

5    charges Mr. Cooper has requested are essentially a proximate

6    cause of harm or proximately caused by your criminal offense.

7           I have looked at the pilots retrieving the plane and

8    those costs.  I have some question about whether or not two

9    pilots were necessary.  Mr. Lane, I know, raised that issue.  I

10   looked at their travel receipts, and they're traveling by

11   limousine when they get on the ground, which doesn't seem to be

12   a reasonable thing to do particularly, you know, where you've

13   got taxis or you can rent a car for much less.  So ultimately,

14   without more information, I'm not going to allow those

15   particular charges as restitution.

16          The plane storage I'm not going to account because in

17   part I don't know whether Mr. Cooper would have to pay storage

18   costs anywhere, wherever he had his planes, and so I don't know

19   whether $50 a day for storing that plane in Washington, Iowa is

20   really the same that he would have paid somewhere else.  Maybe

21   it's not, maybe it is, but without more information, I'm not

22   going to apply that one.

23          With respect to the legal services to obtain the plane

24   back, I just don't know enough here.  That's not an unreasonable

25   amount of money, but there is little case law out here on this

1  particular topic, and so, using my discretion, I just opted not

2  to provide that money as well.

3         So the total amount I am going to apply is $5,000 of

4  restitution to Mr. Cooper.  That is less than the $7,118.17 that

5  he's asked for in damages, but, again, I think some of those

6  damages are related to standard maintenance, and so this is the

7  amount that I think reasonably approximates the damage that was

8  caused by the landing, unscheduled landing, in Washington, Iowa

9  and Mr. Efthimiatos' unexpected flight in the manner in which he

10 did with the marijuana.

11        I will make that amount joint and several with any

12 restitution in the case that's involving Michael Efthimiatos.

13        I do find that no fine is appropriate in this case.  I

14 don't find that Mr. Efthimiatos has the ability to pay a fine

15 and so no fine will be imposed.

16        Forfeiture has been resolved and will continue to be

17 resolved in outside hearings, so I will simply reference those

18 orders of forfeiture that have already been entered, and we have

19 an upcoming hearing, as the parties know, in July to finalize

20 those particular issues.

21        There is a $100 special assessment on each count that

22 must be imposed for a total of $200.

23        The last thing I want to talk to you about,

24 Mr. Efthimiatos, is your right to appeal.  You have 14 days from

25 today to file an appeal of the sentence I just gave to you.  If

1    you don't file an appeal in the next 14 days, you forever give

2    up your right to challenge this particular sentence.

3           If you want to appeal, all you need to do is let

4    Mr. Lane know.  He'll take care of filing that paperwork for

5    you.  To the extent Mr. Lane doesn't want to handle the appeal

6    or financial arrangements have not been made, then if you

7    qualify for appointed counsel, we'll appoint somebody to help

8    you with that particular appeal.

9           What is really important is that Mr. Lane know what

10   you want to do.  A lot of defendants sitting where you're

11   sitting are feeling all kinds of things.  There's probably

12   sadness, there's probably relief that it's over, there's

13   probably all kinds of feelings.  And many defendants are certain

14   they told their lawyer one thing or another and the lawyer is

15   equally certain they heard something different, and years down

16   the road we're having a fight in the courtroom about what was

17   really said, and it's not good for anybody.

18          So the safest thing for you to do is just write it

19   down, "I do," or, "I do not want to appeal."  You sign it, you

20   date it, it protects both of you.  You give it to Mr. Lane.  But

21   if you don't have to time to write it or you don't want to, all

22   you have to do is let him know in the next 14 days, and he'll

23   take care of that for you, okay?

24          DEFENDANT EFTHIMIATOS:  Okay.

25          THE COURT:  Mr. Cronk, we don't have counts to

1   dismiss.   Is there anything else we need to do today?

2             MR. CRONK:   No, Your Honor.

3             THE COURT:   Mr. Lane?

4             MR. LANE:   No, Your Honor.   Thank you.

5             THE COURT:   We are adjourned.   Thank you.

6             (Proceedings concluded at 1:54 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2           I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3    the State of Iowa and Federal Official Realtime Court Reporter

4    in and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations of

10   the Judicial Conference of the United States.

11          Dated at Des Moines, Iowa, this 16th day of July,

12   2014.

13

14

15                        /s/ Kelli M. Mulcahy
                          Kelli M. Mulcahy, CSR No. 941, RMR, CRR
16                        Federal Official Court Reporter

17

18

19

20

21

22

23

24

25